COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, Bumgardner and Senior Judge Overton
Argued at Richmond, Virginia


JANE O'DONNELL

v.        Record No. 0231-03-2

PETERSBURG REDEVELOPMENT AND
 HOUSING AUTHORITY

MEMORANDUM OPINION* BY
JUDGE NELSON T. OVERTON
NOVEBMER 4, 2003

FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
James F. D'Alton, Jr., Judge

Mark Baron for appellant.

Lynn F. Jacob (Williams Mullen, on brief), for appellee.


Jane O'Donnell was employed by the Petersburg Redevelopment and Housing Authority

("PRHA" or the "agency") as Finance Director.  On May 3, 2002, the agency's Executive Director

terminated O'Donnell for cause.  O'Donnell filed a grievance, and a three-member panel ruled, *inter*

*alia*, that O'Donnell should be reinstated.   The agency appealed to the circuit court, which reversed

the hearing panel and reinstated her discharge.  For the following reasons, we affirm the circuit

court's decision.

BACKGROUND

On July 18, 19 and 21, 2002, a three-member panel heard evidence regarding O'Donnell's

grievance.  The following facts are taken from the record, including the panel's written decision

rendered on August 16, 2002.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

O'Donnell has been employed by PRHA since 1986. The agency named her Director of the Finance Department in 1988. In 1992, O'Donnell became a certified public accountant. From 1988 through 1999, while O'Donnell was Finance Director, "the audits of [PRHA's] financial statements and supporting records conducted by outside auditors had always resulted in 'unqualified' opinions with few significant or no audit findings." An "'unqualified' audit is, in essence a clean audit reflecting no major problems."

Until 1998, PRHA "utilized an accounting methodology specified by the federal Department of Housing and Urban Development (HUD)." In 1998, HUD required all agencies that have to report to HUD, "to convert to an accounting methodology known as Generally Accepted Accounting Principles (GAAP) by December 31, 1999." In 1998, the previous Executive Director approved O'Donnell's request for her and another finance department employee to attend a four-day training seminar intended to introduce accountants to GAAP methodology. In addition, the agency hired an outside accounting firm to consult and help the finance department convert to GAAP. "By the end of 1999," O'Donnell and the agency "believed that the changes necessary to be in compliance with GAAP had been accomplished."

In December 2000, the agency hired Nancy Wesoff as the new Executive Director. Wesoff is not an accountant.

Edward Stockton, an outside CPA who had conducted the annual audit for several years, conducted an independent audit of the PRHA's financial records for the year 2000. He completed his audit on May 18, 2001. In it, Stockton advised the Board of Commissioners "there were 'no material instances of noncompliance with the Affirmative Fair Housing requirements,'" and "with one exception, the agency had 'complied, in all material respects, with the requirements . . . applicable to each of its major federal programs for the year ended December 21, 2000.'" "However, because of concerns about maintenance of property records, unreported sale of assets,

and other issues, the auditor's overall conclusion was a 'no opinion' audit." Stockton warned that "[r]eportable conditions" relating to "deficiencies in the design or operation of the internal control over financial reporting that . . . could adversely affect the Petersburg Housing Authority's ability to record, process, summarize and report financial data."

After receiving Stockton's May 18, 2001 report, Wesoff asked Stockton to "expand his usual audit and examine everything the agency was doing from an accounting standpoint." Stockton submitted his report on August 7, 2001, and "concluded in his cover letter that, 'there are opportunities for strengthening internal controls.'" Stockton also "discovered that the Director of Finance did not separate out the various funds as required by GAAP nor convert the underlying chart of accounts from the regulatory basis to the GAAP basis of accounting." Stockton "assumed that the reason [O'Donnell] did not convert to the GAAP basis of accounting was because she did not understand the differences between the GAAP and the regulatory basis of accounting." When pressed about the need to learn and implement GAAP, Stockton reported that O'Donnell replied, "'I don't care what anyone wants. I'm going to do what I damn well please.'" Stockton, who in the past had provided unqualified audits to PRHA, further reported in his cover letter:

> This attitude has and will continue to cause serious problems for the Housing Authority. I recommend that the Board and the Executive Director impress on the Director of Finance an unyielding requirement to comply with all applicable laws, regulations, and accounting standards. Failure to do so may lead to sanctions from Federal authorities and an unwillingness on the part of essential business partners such as banks, underwriters, and insurance providers to work with the Authority.

Stockton found that the "Authority's accounting staff is actually very capable," however, he pointed out that "ability and performance are two very different things." O'Donnell told Stockton "it was unreasonable to expect her to keep up with the new [accounting] requirements affecting the Authority." Such statements supported Stockton's finding that O'Donnell "has demonstrated an unwillingness to assume the responsibility to maintain her own competency." Stockton opined, "If

the Director of Finance is unwilling to invest the time required to become and remain competent and satisfy the employer's accounting needs (even if that requires investing more than forty hours a week which it surely will), then the Authority must look elsewhere for a professional willing to provide the competency, time, and leadership necessary."

Wesoff met with O'Donnell in August 2001, after Stockton submitted his report, "to discuss the need for changes." Wesoff "concluded that [O'Donnell] was resistant to change." Wesoff contracted with Cornwell Associates (Cornwell), an independent accounting consulting firm, "to help the agency bring its accounting system into full compliance with GAAP." Upon arriving in mid-August 2001,[1] Cornwell "reviewed the auditor's report, conducted his own review, and concluded that the outside auditor had correctly identified problems that required remedial action."

On August 29, 2001, the agency notified O'Donnell that "it was no longer in the Housing Authority's best interest to retain [her] in its employ." O'Donnell "was placed on administrative leave and given an opportunity to consider resignation and a severance package." In an October 26, 2001 letter to O'Donnell, Wesoff stated that "the agency 'has lost confidence in your ability,' that her performance is at the level of 'proven incompetence,'" and that she 'materially misrepresented' information." However, Wesoff informed O'Donnell that "the agency is willing to allow [O'Donnell] to return to work on October 31, 2001." One of O'Donnell's "subordinates" that was discharged at the same time was also allowed to return to work in mid-December 2001.

On November 2, 2001, Wesoff notified O'Donnell in writing that "her overall performance was deemed unsatisfactory and that significant improvement would be necessary for [her] continued employment" as Finance Director. Wesoff listed fifteen areas in which O'Donnell's "performance is

---

[1] The panel decision erroneously referenced the date that Cornwell arrived and reviewed Stockton's report. The date was mid-August 2001, not "mid-August 2002."

unsatisfactory" and requested that O'Donnell "develop a detailed improvement plan and submit it by November 13, 2001." O'Donnell "submitted her written plan on November 15, 2001."

On January 3, 2002, Cornwell sent a list of information and documentation "needed for F[iscal] Y[ear] E[nding] December 31, 2001 closing." Wesoff provided a copy to O'Donnell on January 4, 2002.

On April 4, 2002, Wesoff "requested a report from [O'Donnell] on the progress of her plan." Wesoff asked that O'Donnell submit her report by April 10, 2002.

In a letter to Wesoff dated April 11, 2002, Cornwell pointed out two improper accounting practices performed by O'Donnell in 2001.

In a memorandum dated April 19, 2002, O'Donnell apologized to Wesoff for her failure to respond to Wesoff's memo by April 10, 2002. O'Donnell took issue with Wesoff for failing to provide guidance in her self-improvement memo or to review her progress and for directing O'Donnell to give a subordinate (Theda Peterson) a memo regarding Peterson's failure to maintain proper records. O'Donnell was "not in total agreement with the memo," thus she advised Wesoff that she had "not tendered it to Ms. Peterson [because O'Donnell] believe[d] the information to be incorrect."

On that same date, April 19, 2002, O'Donnell filed a grievance "alleging unfair application of policies, retaliation, and arbitrary/capricious discipline." O'Donnell arrived for an April 26, 2002 meeting scheduled with Wesoff, however, O'Donnell objected to Wesoff's decision to have one of O'Donnell's "fellow employees" present to observe the meeting. Thus, the meeting never took place.

On April 29, 2002, Wesoff met with O'Donnell about work-related issues. O'Donnell "walked out of the meeting because she was under stress and felt the discussion was pointless." O'Donnell "left work early after [Wesoff] told her to take a few days off." O'Donnell called in

sick on April 30, 2002.  O'Donnell "attempted to speak with [Wesoff] but was unable to reach her and left a message."  On May 1, 2002, O'Donnell's "mother delivered a physician's excuse from work to the agency."  The agency discharged O'Donnell on May 3, 2002 while she was on sick leave.

### THE HEARING PANEL'S DECISION

On August 16, 2002, the three-member panel issued its decision.  The panel addressed PRHA's arguments in support of its decision to terminate O'Donnell.  After reviewing the record, the panel classified some decisions made by the agency as "arbitrary" and "concluded that the decision to discharge [O'Donnell] was, on the whole, arbitrary."  The panel emphasized that its decision related to O'Donnell's discharge, not her job performance or her capability of attaining the level of skill necessary to satisfactorily implement GAAP.  As a result, the panel rescinded O'Donnell's termination and reinstated her with full back pay and benefits.

### APPEAL OF THE PANEL DECISION TO THE CIRCUIT COURT

On December 13, 2002, the trial court conducted a hearing at which it heard argument regarding the agency's appeal of the panel's decision.  In making its determination, the trial court explained:

> I'm getting down to what I think is the crux of this, of this dispute; and that is, whether what they did was arbitrary and capricious. And I don't think I have to find that they relied on evidence not in the record, and I don't so find.  But I think I go to what they concede in their decision as to whether, based on their findings – and I think these are their findings – and you can correct me if I'm not mistaken [sic] – but their findings in – and these are their findings – that Ms. O'Donnell has an inadequate knowledge base. She failed to correctly account to HUD for expenses.  She moved expenses from one program to another without permission.  She disregarded instructions of the director if she didn't agree with them.  She walked out of a meeting.  But I don't think they disregarded the appropriate standard of review.  I think it's arbitrary and capricious.

But I do think, and I read from their opinion, that they went beyond what they were allowed to do. And what they concede and what they ultimately say, it's important to emphasize the decision does not express an opinion as to whether job performance is up to requirements of the position, or that she's qualified to remain in the position. Notes that with the advent of GAAP, the knowledge required of directors increased in order to remain current. She must require significantly more training and knowledge was required [sic] when it was considered sufficient prior to GAAP.

And for those reasons, they do go on and acknowledge all of these things, and basically supplanted their, their determination of what was appropriate discipline for that of the Petersburg Redevelopment and Housing Authority.

So for those reasons, I find that the decision is contrary to the law, and that is the Court's ruling.

## QUESTIONS PRESENTED

O'Donnell contends the trial court committed reversible error in applying an incorrect standard of review to the hearing panel's decision. O'Donnell further argues that the trial court ignored, contrary to its authority, the "panel's factual findings as to whether or not key personnel policies of PRHA had been arbitrarily applied or misapplied" and it erred in finding that the panel's decision was contrary to law. Finally, O'Donnell contends the trial court erred in refusing to award her attorney's fees.

## STANDARD OF REVIEW

PRHA's Grievance Procedure handbook authorizes a hearing panel to grant appropriate relief, including "reinstatement," "an award of no, partial, or full back pay; and the restoration of full benefits, seniority, and other legal entitlements." The panel's decision "must be in writing and contain the findings of fact as to the material issues in the matter and the basis for those findings." The panel may not "mitigate the punishment awarded in discipline or discharge cases *unless there has been a finding that the Housing Authority's actions in awarding the discipline or discharge were arbitrary or capricious or inconsistent with its policy*." Petersburg

- 7 -

Redevelopment and Housing Authority Employee Grievance Procedure Manual § L(1) (effective May 2, 2002) (hereafter "PRHA Grievance Manual") (emphasis added). Moreover, "[t]he decision is final and binding if consistent with the Housing Authority's policy and applicable law." Finally, the procedure mandates that in an appeal of a hearing panel decision, the circuit court "shall hear the appeal on the record. The court may affirm the decision or may reverse or modify the decision." See also Tatum v. Department of Agric. and Consumer Servs., 41 Va. App. 110, 122, 582 S.E.2d 452, 458 (2003) ("Upon judicial review from the administrative grievance hearing, the circuit court, based on the record and sitting without a jury, may affirm, reverse or modify the hearing officer's decision.").

"[T]he only grounds of appeal of the hearing officer's decision [to the circuit court] is 'that the determination is contradictory to law.'" Virginia Dep't of State Police v. Barton, 39 Va. App. 439, 445, 573 S.E.2d 319, 322 (2002) (quoting Code § 2.2-3006(B)).

> [D]eterminations of the circuit court may be appealed to this Court, pursuant to Code § 17.1-405(1), granting any aggrieved party the ability to appeal "[a]ny final decision of a circuit court on appeal from . . . a grievance hearing decision issued pursuant to § 2.2-3005." Code § 17.1-405(1). Thus, because the General Assembly granted to the circuit courts only the authority to consider whether the final determination of the hearing officer is "contrary to law," we are likewise limited to such review in considering whether the trial court erred in its determination.

Pound v. Department of Game and Inland Fisheries, 40 Va. App. 59, 63-64, 577 S.E.2d 533, 535 (2003); see also Tatum, 41 Va. App. at 122, 582 S.E.2d at 458 (the party that appeals a hearing panel's decision to the circuit court, is "required to 'specify how that decision [was] "contradictory" to law and what "law" [was] thereby being contradicted'" (quoting Barton, 39 Va. App. at 445-46, 573 S.E.2d at 322)).

ANALYSIS

ARGUMENT I.  Trial Court Applied Incorrect Standard of Review

In its final order, the circuit court clearly explained that the hearing panel had no authority to override a management decision "unless the discipline meted out [by the agency] is arbitrary or capricious."  Thus, the trial court set forth the correct standard of review.  The trial court then ruled that the hearing panel "acted outside its authority, and thus, contrary to law, when it substituted its opinion about the appropriate discipline to be awarded to Ms. O'Donnell for that of the [PRHA]."

Contrary to appellant's assertion, the circuit court did not implicitly apply an incorrect standard for reviewing the decision of the hearing officer.[2]  The trial court applied the correct standard when it found that the panel acted "contrary to law" when it determined contrary to the evidence that the agency acted arbitrary and capricious.  See Barton, 39 Va. App. at 445-46, 573 S.E.2d at 322 (explaining that the only ground of appeal for reviewing grievance panel decision is that the decision is contradictory to law).  Accordingly, the trial court did not apply an incorrect standard.

ARGUMENTS II. AND III.  Trial Court Erred in Overriding Panel's Decision

Code § 15.2-1507 requires grievance procedures to be "consistent with the provisions of Chapter 10 (§ 2.2-100 et. seq.) of Title 2.2."

Code § 2.2-3005 lists the powers and duties of hearing officers.  Code § 2.2-3005(D) provides that the decision of the hearing officer shall "be final and binding if consistent with law

---

[2] O'Donnell's confusion may have been due to the trial judge's statement that "I'm getting down to what I think is the crux of this . . . dispute; and that is whether what they did was arbitrary and capricious."  Any confusion however was clarified by the trial judge when he found that the panel's decision was "contrary to the law."  The trial judge based this decision on the panel's findings and record evidence demonstrating that the agency had sufficient, valid and multiple reasons to discharge O'Donnell.

and policy." Code § 2.2-3006(B) explains that a "party may appeal on the grounds that the determination is contradictory to law." The circuit court "shall hear the appeal on the record," after which it may "affirm the decision or may reverse or modify the decision." Id.

The PRHA Grievance Manual sets forth the rights and procedures involving grievances. The Grievance Manual is the Authority's means of effectuating the law as mandated by Code §§ 2.2-3005, 2.2-3006 and 15.2-1507, as they relate to employee grievances. Pursuant to the Manual, the hearing panel "should not mitigate the punishment awarded in discipline or discharge cases unless there has been a finding that the Housing Authority's actions in awarding the discipline or discharge were arbitrary or capricious or inconsistent with its policy." PRHA Grievance Manual at § L(1).

Section 3.9 of the Personnel Policy and Employee Handbook for PRHA (the Employee Handbook) provides:

> The Executive Director or supervisor may first advise an employee verbally if he or she is not performing to the acceptable standards.
> If satisfactory improvements are not exhibited after a verbal warning, a written warning may be given to the employee for review and action.
> If the employee's performance does not improve to an acceptable level after a written warning, or where, in the discretion of management, preliminary warnings are not warranted, further action will be taken, which may include suspension without pay, demotion or reduction in salary, or termination.

Section 5.0 of the Employee Handbook discusses disciplinary actions. The Authority may dismiss an employee due to "unsatisfactory work performance or misconduct." Id. at § 5.1. One enumerated reason for such action is "[i]nefficiency, negligence or incompetence in the performance of duties." Id. at § 5.2(e). The Handbook lists "[p]roven incompetence or inefficiency in the performance of assigned duties in his/her position" as a Group III Rules and Regulations violation. Id. at § 5.3.3(j).

In Section 7.8 of the Employee Handbook, PRHA explains its "hope to retain good employees."

> However, employment at the Housing Authority is for no specified time, regardless of length of service. Just as you are free to leave for any reason, we reserve the same right to end our relationship with you at any time, with or without notice, for any reason not prohibited by law.

Id.

"Actions are defined as arbitrary and capricious when they are 'willful and unreasonable' and taken 'without consideration or in disregard of facts or law or without determining principle.'" School Bd. of City of Norfolk v. Wescott, 254 Va. 218, 224, 492 S.E.2d 146, 150 (1997) (quoting Black's Law Dictionary 105 (6th ed. 1990)).

The panel concluded that O'Donnell "has not acquired sufficient familiarity with GAAP to be in complete compliance with" HUD requirements. The panel found that O'Donnell's "knowledge base requires updating." Two sentences later, the panel found "[e]ither [O'Donnell] requires training to gain efficiency in her work, or the job has grown too complex for her knowledge, skills and abilities." The panel then surmised, "Without giving [O'Donnell] the opportunity to increase her knowledge base, one cannot *arbitrarily conclude* that she can no longer handle the role of Finance Director." (Emphasis added.)

Despite the panel's discussion of "arbitrary decisions revealed by the evidence," the panel "emphasize[d] that [its] decision does *not* express an opinion as to whether" O'Donnell "is up to the requirements of the position or that she is qualified to remain in the position of Director of Finance." The panel also refused to opine whether O'Donnell "is capable of acquiring the required training, or of making the changes required to modernize the accounting practices of the agency."

In other words, the panel found the decision to terminate O'Donnell arbitrary and capricious because it did not invest enough time and resources into evaluating and training her to perform the job for which she was hired. In effect, the panel found that the long-standing deficiencies in O'Donnell's skills and abilities and her lack of desire to obtain "the knowledge required of a Finance Director" fell upon the Authority. However, the record showed that HUD first advised PRHA in 1998 of its intention to convert to GAAP. In that same year, the previous Executive Director approved O'Donnell's request to attend a four-day GAAP seminar. PRHA also hired an outside consultant to assist in the conversion to GAAP, so that by the end of 1999, "[O'Donnell] and the agency believed that the changes necessary to be in compliance with GAAP had been accomplished."

The panel acknowledged in its decision that, due to some questionable practices, the audit for fiscal year ending 2000 resulted in a "no opinion" audit. In fact, HUD's "annual 'report card'" for that year gave the Authority a score of 56 out of a possible 100. The panel noted that "HUD considers a score below 60 to be an indicator of a 'troubled agency.'"

Thus, the record, including the panel's decision, contains evidence that O'Donnell has been unable or unwilling from 1998 until the time of her discharge to become sufficiently proficient in her field so as to effectuate the conversion to GAAP. The panel decision also documented certain negative conduct by O'Donnell, such as "walk[ing] out of a meeting" with Wesoff "because she was under stress and felt the discussion was pointless," and submitting her improvement plan two days late. Moreover, the panel's conclusion that the decision to ignore the mandate of Agency Policy 2.11 for annual evaluations "was an arbitrary decision not warranted by any evidence in the record" failed to take into account Wesoff's many oral and written criticisms that her performance as Finance Director was not satisfactory. See Employee

Handbook, § 3.9 (providing that Executive Director may first advise an employee verbally of poor performance, and if not corrected, a written warning may follow).

The record supports the trial court's observation that "[t]here is no evidence to suggest that [PRHA] came to its decision to terminate Ms. O'Donnell blindly or without a reasoned basis." See Wescott, 254 Va. at 224, 492 S.E.2d at 150 (defining arbitrary and capricious actions as actions taken "'without consideration or in disregard of facts or law'"). We also conclude that the evidence failed to support the panel's decision that the discharge of O'Donnell was arbitrary and capricious. Because the Grievance Procedure required such a finding before the panel was authorized to mitigate PHRA's termination decision, see PRHA Grievance Manual at § L(1), we hold that the panel's decision was "contradictory to law." Tatum, 41 Va. App. at 122, 582 S.E.2d at 458.

### ARGUMENT IV. Attorney's Fees

Because O'Donnell did not substantially prevail, she is not entitled to attorney's fees. See Code § 2.2-3006(D).

For the foregoing reasons, we affirm the decision of the circuit court.

Affirmed.